IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BRANDY HAYES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 4:24-cv-00816-ALM |
| | § | |
| CHARLES SCHWAB & CO., INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

316732942v.5

## **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION AND STATEMENT OF THE REASONS IN SUPPORT OF THE MOTION .................................................................................................. 1

II.  STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT .......................... 3

III. STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 3

    A.   Schwab Hires Hayes as Associate ........................................................... 3

    B.   Hayes Transfers to a Different Associate Role ........................................ 4

    C.   Hayes Discusses Her Pregnancy With Bergeron ..................................... 5

    D.   Hayes Receives a Coaching Memo .......................................................... 5

    E.   Hayes Discusses Her Pregnancy With Alexander ................................... 8

    F.   Hayes Engages with Human Resources While on STD Leave .............. 8

    G.   Hayes Returns From Short-Term Disability Leave .............................. 11

    H.   Hayes Receives a Written Warning ....................................................... 12

    I.   After Bergeron Initiated Termination of Her Employment, Hayes Begins Maternity Leave Earlier Than Planned ................................................... 13

    J.   Schwab Terminates Hayes's Employment ............................................ 14

IV.  ARGUMENT ......................................................................................................... 15

    A.   Summary Judgment Standard ................................................................ 15

    B.   Plaintiff's PWFA Claim Fails As a Matter of Law .............................. 15

    C.   Schwab Is Entitled to Summary Judgment on Plaintiff's FMLA Retaliation Claim ................................................................................... 16

        1.   Hayes Cannot Show Causation Necessary to Establish a *Prima Facie* Case of FMLA Retaliation ............................................. 18

        2.   Hayes Cannot Show Pretext or Retaliatory Motive ................... 19

V.   CONCLUSION ....................................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*,
   699 F.3d 832 (5th Cir. 2012) ..................................................15

*Adams v. Mem'l Hermann*,
   973 F.3d 343 (5th Cir. 2020) ..................................................17

*Alexander v. Two Oaks Invs., LLC*,
   No. 23-CV-00406-SH, 2024 WL 3747166 (N.D. Okla. Aug. 9, 2024)..................................15

*Amsel v. Texas Water Dev. Bd.*,
   464 F. App'x 395 (5th Cir. 2012) (per curiam) ..................................................19

*Besser v. Texas Gen. Land Off.*,
   834 F. App'x 876 (5th Cir. 2020) ..................................................18

*Campos v. Steves & Sons, Inc.*,
   10 F.4th 515 (5th Cir. 2021) ..................................................17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................15

*Clark Cnty. Sch. Dist. v. Breeden*,
   532 U.S. 268 (2001) ..................................................18

*Gross v. FBL Financial Services, Inc.*,
   557 U.S. 167 (2009)..................................................17

*Haverda v. Hays County*,
   723 F.3d 586 (5th Cir. 2013) ..................................................21

*Ion v. Chevron USA, Inc.*,
   731 F.3d 379 (5th Cir. 2013) ..................................................16

*LeMaire v. La. Dep't of Transp. and Dev.*,
   480 F.3d 383 (5th Cir. 2007) ..................................................21

*Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*,
   446 F.3d 574 (5th Cir. 2006) ..................................................20

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)..................................................17

316732942v.5

*Ray v. United Parcel Serv.*,
    587 F. App'x 182 (5th Cir. 2014) ...................................................................20, 21

*Richardson v. Monitronics Intern., Inc.*,
    434 F.3d 327 (5th Cir. 2005) .................................................................................17

*Stanton v. Jarvis Christian Coll.*,
    No. 20-40581, 2022 WL 738617 (5th Cir. Mar. 11, 2022)....................................17

*Tuberville v. Pers. Fin. Corp.*,
    No. 3:95CV150-B-A, 1996 WL 407571 (N.D. Miss. June 5, 1996).....................20

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)...............................................................................................17

**Statutes**

29 U.S.C. § 2611(2)(A)................................................................................................18

29 U.S.C. § 2612(a)(1)................................................................................................18

29 U.S.C. § 2614(a)(1)................................................................................................18

29 U.S.C. § 2615(a)(2).................................................................................1, 3, 16, 17

Consolidated Appropriations Act, Pub. L. 117-328, div. II, § 109, 136 Stat. 4459,
    6089 (2022)............................................................................................................15

Family and Medical Leave Act...................................................................... *passim*

Pregnant Workers Fairness Act .................................................................... *passim*

**Other Authorities**

29 C.F.R. § 825.220(c)................................................................................................16

Fed. R. Civ. P. 56..........................................................................................................1

Fed. R. Civ. P. 56(a) ...................................................................................................15

Local Rule CV-56..........................................................................................................1

316732942v.5

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule CV-56,

Defendant Charles Schwab & Co., Inc. ("Defendant" or "Schwab") files this motion for partial

summary judgment ("Motion"), seeking dismissal of the Plaintiff Brandy Hayes's ("Plaintiff" or

"Hayes") claims brought under the Family and Medical Leave Act ("FMLA") and Pregnant

Workers Fairness Act ("PWFA").

## I.    INTRODUCTION AND STATEMENT OF THE REASONS IN SUPPORT OF THE MOTION

Among other claims not at issue in this Motion, Hayes claims that Schwab violated the

PWFA by failing to provide her penalty-free breaks for her pregnancy-related condition:

hyperemesis gravidarum ("HG"), a severe type of nausea and vomiting during pregnancy. She

also claims that, in terminating her employment, Schwab discriminated or retaliated against her

for exercising her FMLA rights, in violation of 29 U.S.C. § 2615(a)(2). Both claims fail as a

matter of law.

First, the PWFA took effect on June 27, 2023. However, the only communications Hayes

had with anyone at Schwab about needing to take breaks for HG—including conversations with

her supervisor, who told her she could take breaks as needed as long as she let him know before

stepping away—occurred before June 27, 2023. Hayes was on a short-term disability ("STD")

leave from April 17, 2023 through June 22, 2023. While Hayes claims that, after she returned

from STD leave, she submitted a written request for a break accommodation to Schwab's

Accommodations team, she has not produced a copy of this request, and Schwab has no record

of it. Absent any evidence that Hayes requested but was denied a break accommodation on or

after the date the statute took effect, Hayes's PWFA claim fails as a matter of law.

Second, Hayes cannot establish *prima facie* FMLA discrimination/retaliation. After she

was unsuccessful in the role Schwab hired her in August 2022 to perform, Hayes began training

1

for a different role in January 2023. After a preliminary training period, Hayes began reporting to John Bergeron in March 2023. Bergeron quickly identified deficiencies in Hayes's performance, resulting in a Coaching Memo in April 2023, a Written Warning in July 2023, and the initiation of Hayes's termination in early September 2023. In other words, by the time Hayes became FMLA-eligible, and months before her anticipated October 2023 maternity leave, the gears for terminating her employment were already in motion. Indeed, Bergeron had decided to terminate Hayes's employment by early September 2023, before Hayes unexpectedly began FMLA leave on September 13, 2023. Hayes exhausted the twelve weeks of FMLA leave on December 6, 2023 and remained on maternity leave for another two months, returning to work on February 12, 2024 after five months away. Upon her return, Schwab terminated her employment, based on the recurring performance deficiencies Hayes exhibited throughout her time in the role, beginning months before she even became FMLA eligible. Thus, while Hayes can satisfy the first and second elements of *prima facie* FMLA retaliation—that she exercised FMLA rights and her employment was terminated, respectively—she cannot satisfy the third element by showing a causal relationship between the two events.

Third, even if Hayes could establish *prima facie* FMLA retaliation, Schwab had a legitimate, nonretaliatory reason for terminating her employment, as reflected in her well-documented performance deficiencies. Hayes does not concede that this reason is true, and thus a pretext framework, rather than a mixed-motive framework, applies to her claim. But under either framework, Schwab is entitled to summary judgment. Hayes cannot point to any evidence that this reason is pretextual, nor can she show that Schwab had a mixed motive for terminating her, i.e., that while her poor performance was one of Schwab's reasons, her exercise of FMLA rights

2

316732942v.5

also was a motivating factor in the termination decision. Absent such evidence, Hayes's FMLA retaliation claim fails as a matter of law.

## II.    STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT

This Motion presents the following issues to be decided by the Court:

Whether Hayes requested and was denied breaks as an accommodation after the PWFA took effect;

Whether Hayes has failed to establish *prima facie* FMLA discrimination/retaliation under 29 U.S.C. § 2615(a)(2);

If Hayes has established *prima facie* FMLA discrimination/retaliation under 29 U.S.C. § 2615(a)(2), whether a pretext or mixed-motive framework applies; and

If Hayes has established *prima facie* FMLA discrimination/retaliation under 29 U.S.C. § 2615(a)(2), whether Hayes has offered sufficient evidence to create a genuine issue of fact that: (a) Schwab's reason for terminating her employment was pretextual or (b) if the Court finds that the mixed-motive framework applies, while Schwab's reason for terminating her employment was true, her exercise of FMLA rights was also a motivating factor in the termination decision.

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Schwab Hires Hayes as Associate

Hayes began working for Schwab on August 8, 2022, as an associate in its Schwab Service Academy ("SSA").[1] The SSA program provides employees with paid training, study support, and mentorship opportunities needed to prepare the employees for their Securities Industry Essentials, Series 7, and Series 63 licenses exams.[2] Despite the training, study support,

---

[1] Exhibit A, Excerpts from the February 19, 2025 Deposition of Brandy Hayes ("Hayes Dep."), at 16:9-11, 16:21-24, 70:23-71:6.

[2] Ex. A, Hayes Dep., at 17:8-13, 71:7-12.

3

and mentorship, Hayes did not pass her exams.[3] Therefore, she could not continue on her original Schwab career path as a licensed employee.[4]

### B.    Hayes Transfers to a Different Associate Role

Hayes applied, interviewed, and was selected for a different Associate role, in the Advisor Services Group.[5] Hayes transitioned to her new role in January 2023.[6] For the first approximately six weeks in that role, Hayes was trained by and reported to LaTisha Munson.[7] After that initial training period, Hayes began reporting to John Bergeron, who in turn reported to Richard "Ricky" Alexander.[8]

As an associate in the Advisor Services Group, Hayes received calls from advisors needing assistance to complete various tasks for their clients, such as moving money between accounts, sending checks, and transferring accounts into and out of Schwab.[9] Her role was to assess the advisors' needs and assist them with their requests.[10] If Hayes did not know how to complete a transaction, she had several resources available to her, including an online Knowledge Center, which provides how-to information on completing transactions and internal group chats where her management and team members respond to questions.[11]

---

[3] Ex. A, Hayes Dep., at 71:13-18.

[4] Ex. A, Hayes Dep., at 71:19-22.

[5] Ex. A, Hayes Dep., at 17:13-23, 18:2-5, 72:25-73:7; Ex. 1 to Ex. A, Hayes Dep., at Schwab/Hayes 000001–02.

[6] Ex. A, Hayes Dep., at 22:1-3; Ex. 1 to Ex. A, Hayes Dep., at Schwab/Hayes 000001–02.

[7] Ex. A, Hayes Dep., at 18:16-19:12.

[8] Ex. A, Hayes Dep., at 18:23-24, 31:6-14.

[9] Ex. A, Hayes Dep., at 18:2-15, 73:18-74:1.

[10] Ex. A, Hayes Dep., at 74:2-5.

[11] Ex. A, Hayes Dep., at 74:6-13.

### C.    Hayes Discusses Her Pregnancy With Bergeron

At some point, Hayes submitted to Schwab a doctor's note dated March 15, 2023, which reflects her hyperemesis gravidarum ("HG") diagnosis and describes the symptoms.[12] The only accommodation identified in the March 15, 2023 note is working from home through April 17, 2023.[13] Shortly after the date of the note, Hayes began working from home.[14] Hayes admits that the doctor's note she submitted to Schwab does not state that she would need to take frequent breaks.[15] However, Hayes claims to have had a discussion with Bergeron prior to April 7, 2023, during which she told him that, because of HG, she "would need to take breaks from [her] phone calls to be able to go use the restroom whenever [she] needed" and "did not want [her] availability and adherence metrics to keep being scrutinized or penalized."[16] According to Hayes, Bergeron told her that if she ever needed a break because of her HG, "just ping me and let me know."[17] Hayes further claims that she did ping Bergeron whenever she needed to take a break.[18]

### D.    Hayes Receives a Coaching Memo

On April 7, 2023, Bergeron issued Hayes a Coaching Memo, following up on a coaching discussion they had on April 4.[19] In the Coaching Memo, Bergeron wrote,

> In a review of recent call behaviors, we identified a number of calls were being transferred to other departments for topics that are owned by the Service team.

---

[12] Ex. A, Hayes Dep., at 33:5-19, 34:11-13; Ex. 4 to Ex. A, Hayes Dep., at Hayes 142.

[13] Ex. A, Hayes Dep., at 33:20-23; Ex. 4 to Ex. A, Hayes Dep., at Hayes 142.

[14] Ex. A, Hayes Dep., at 33:24-34:6. After she received the accommodation of working from home in March 2023, Hayes never worked in the office again. Ex. A, Hayes Dep., at 81:7-9, 83:6-8.

[15] Ex. A, Hayes Dep., at 79:22-24.

[16] Ex. A, Hayes Dep., at 87:6-15, 87:19-22.

[17] Ex. A, Hayes Dep., at 50:5-9, 87:15-18.

[18] Ex. A, Hayes Dep., at 87:23-24.

[19] Ex. A, Hayes Dep., at 25:20-26:12; Ex. 5 to Hayes Dep.

> These transfer[s] were completed without a full review of the question/situation and the calls were cold transferred to outside departments. Our expectation is that we own each call that we receive and own the situation through to completion. We should make a complete attempt to identify the purpose [of] each call and provide guidance on next steps.[20]

Hayes claimed at her deposition that this feedback did not accurately describe a shortcoming in her performance, but her testimony did not reflect that the feedback was actually inaccurate.[21] Rather, Hayes explained that, prior to this coaching, she had not received a list of departments to which she could "cold transfer"—transfer a call from an advisor to another department without an introduction or explanation as to what the advisor needed—and she had been operating under an understanding that, if "a specific topic at hand" was "not our department or our expertise," she was allowed to make a cold transfer.[22] According to Hayes, as part of the coaching, she was "instructed on how to properly handle the situation" and provided a list of departments to which she could cold transfer.[23]

The Coaching Memo went on to explain that Hayes had been transferring calls "to other Specializations within Service (ES/SES). Our expectation is that we own each call received and utilize our team chat and [Team Lead/Team Members] for assistance when needed rather than transferring to another Specialization within the organization."[24] Hayes did not disagree with this feedback but asserted that "there was no one in the chat to help" her and that, "whenever [she] did put something in the chat, it would take up to 30 minutes, sometimes," for her to receive a

---

[20] Ex. 5 to Ex. A, Hayes Dep., at Hayes 097.

[21] Ex. A, Hayes Dep., at 26:19-28:2.

[22] Ex. A, Hayes Dep., at 27:17-24.

[23] Ex. A, Hayes Dep., at 27:25-28:5.

[24] Ex. 5 to Ex. A, Hayes Dep., at Hayes 097.

6

response.[25] Hayes discussed this concern with Bergeron during their April 4, 2023 coaching discussion.[26] Bergeron advised Hayes to keep trying to utilize the chat and to use the knowledge bank on Schwab's website.[27]

In addition, the Coaching Memo stated that there were multiple instances when Hayes had "large gaps of time between calls," emphasized the expectation to "prioritize being available for the next [advisor] after the conclusion of each call," and reminded Hayes to "connect with leadership prior to unscheduled off the phone activities to ensure we are [being] mindful of incoming calls and volumes."[28] Hayes agreed that this coaching accurately described her performance.[29]

The Coaching Memo also identified the need for "immediate and sustained improvement" in the metrics of availability ("how much time I spent in the available status," i.e., ready to take a call) and adherence ("the amount of time that I was on the phone").[30] The Coaching Memo further advised Hayes, "Failure to improve and sustain your conduct to an acceptable level could lead to further corrective action, up to and including termination of employment."[31]

Finally, the Coaching Memo directed Hayes to reach out to Bergeron or her "one over manager" (Alexander) if she had questions about the contents of the Coaching Memo or the

---

[25] Ex. A, Hayes Dep., at 28:6-24.

[26] Ex. A, Hayes Dep., at 28:25-29:2.

[27] Ex. A, Hayes Dep., at 29:3-5.

[28] Ex. 5 to Ex. A, Hayes Dep., at Hayes 097.

[29] Hayes Dep., Ex. A, at 29:12-25.

[30] Hayes Dep., Ex. A, at 30:6-15; Ex. 5 to Hayes Dep. at Hayes 097.

[31] Ex. 5 to Ex. A, Hayes Dep., at Hayes 098.

corrective action process, and provided a link to Schwab's Resolving Workplace Issues policy.[32] Even though Hayes disagreed "in large part" with Bergeron's assessment of her performance, she did not raise any concerns she had about the Coaching Memo with Alexander.[33]

### E.    Hayes Discusses Her Pregnancy With Alexander

Shortly after she received the April 7, 2023 Coaching Memo, Hayes had what she described as a "casual conversation" with Alexander in a Microsoft Teams chat, in which she discussed her high-risk pregnancy, her metrics, the reasons for her metrics, and that she would provide doctors' notes to support the accommodations that she needed so that she would not be penalized for her availability and adherence metrics.[34] According to Hayes, Alexander was "very helpful" and "really supportive within that conversation."[35]

On April 17, 2023, Hayes began a short-term disability ("STD") leave of absence.[36] Hayes did not seek an accommodation for needing to take breaks prior to going on STD leave.[37]

### F.    Hayes Engages with Human Resources While on STD Leave

On or about April 17, 2023, Hayes submitted an allegation of discrimination through Schwab's MyHR portal.[38] On May 1, 2023, Hayes met with Jessica DiSanzo, an employee in Schwab's Human Resources ("HR") group, to discuss Hayes's report, including questions Hayes had raised about the Coaching Memo.[39] Hayes related to DiSanzo that she "felt that [Bergeron]

---

[32] Ex. 5 to Ex. A, Hayes Dep., at Hayes 098.

[33] Hayes Dep., Ex. A, at 31:15-22.

[34] Ex. A, Hayes Dep., at 31:21-32:21.

[35] Ex. A, Hayes Dep., at 32:22-24.

[36] Ex. A, Hayes Dep., at 52:4-8, 52:12-19; Ex. B, DiSanzo Decl., at ¶ 3.

[37] Ex. A, Hayes Dep., at 78:12-21.

[38] Ex. A, Hayes Dep., at 95:1-16, 164:7-24.

[39] Ex. A, Hayes Dep., at 44:2-14; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Exhibit B, Declaration of Jessica DiSanzo ("DiSanzo Decl."), at ¶ 2; Ex. 1 to Ex. B at Schwab/Hayes

8

scheduled several coaching sessions, and meetings as a result" of Hayes disclosing to Bergeron that she was pregnant.[40] Hayes's only reason for correlating her pregnancy with the Coaching Memo was the amount of time between the events (about 29 days) and "the continuous conversations [she] got about [her] metrics."[41] DiSanzo explained to Hayes that Bergeron "was reacting to where she was on the learning curve. Her metrics were lower than expected and he scheduled the time to coach her to improve."[42] Hayes does not dispute that Bergeron was coaching her to improve but takes issue with his approach, which she describes as "always reprimanding" and not "very positive."[43] Hayes further contends that Bergeron continued to coach her even when "some of [her] metrics were actually doing outstanding."[44] Hayes related to DiSanzo that "it was the ad hoc calls to discuss her errors that upset her most."[45] DiSanzo "explained that it is best practice to address errors and feedback right away so she can learn from it and do better the next time."[46]

---

001102 (original record with the same notes of DiSanzo's May 1, 2023 call with Hayes as Ex. 2 to Hayes Dep. at Schwab/Hayes 001247).

[40] Ex. A, Hayes Dep., at 44:20-45:12; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[41] Ex. A, Hayes Dep., at 44:20-45:12; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[42] Ex. 2 to Ex. A, Hayes Dep., at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[43] Ex. A, Hayes Dep., at 45:17-22.

[44] Ex. A, Hayes Dep., at 45:22-25.

[45] Ex. 2 to Ex. A, Hayes Dep., at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[46] Ex. 2 to Ex. A, Hayes Dep., at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

DiSanzo also addressed Hayes's concern that she was being penalized for calling specialty teams for support.[47] DiSanzo clarified that the conduct that concerned Bergeron was "transferring the call and not staying on. Specialty teams do not talk to advisors or clients. They can provide the information while she is on the line but not without her. This can look like work avoidance, so he wants to be sure she doesn't do it that way again."[48] Hayes understood the performance issue Bergeron had identified as DiSanzo explained it.[49] According to Hayes, these expectations had not been made clear to her during her training, but through Bergeron's coaching, by the time she spoke with DiSanzo, she understood Bergeron's expectations.[50]

DiSanzo also discussed with Hayes that time away from her computer for health reasons typically must be recorded as an unpaid break, but Bergeron did not want to require Hayes to take unpaid breaks at that time.[51] Rather, as Bergeron relayed to Hayes both directly and through DiSanzo, Hayes simply needed to let him know when she was leaving her desk.[52]

During their call, DiSanzo recommended to Hayes that she contact the accommodations team to get a formal accommodation in place for break time.[53] Hayes told DiSanzo that she would do so.[54]

---

[47] Ex. 2 to Ex. A, Hayes Dep., at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[48] Ex. 2 to Ex. A, Hayes Dep., at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[49] Ex. A, Hayes Dep., at 46:6-21.

[50] Ex. A, Hayes Dep., at 46:22-48:1.

[51] Ex. A, Hayes Dep., at 49:13-50:5; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[52] Ex. A, Hayes Dep., at 49:13-50:9; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[53] Ex. A, Hayes Dep., at 50:18-21; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

316732942v.5

At the conclusion of their call, Hayes told DiSanzo that she (DiSanzo) had covered everything, and that Hayes did not have any further questions.[55]

### G.    Hayes Returns From Short-Term Disability Leave

Hayes was on STD leave from April 17, 2023 through June 22, 2023, returning June 26, 2023.[56] When she returned to work, she continued working on a remote basis.[57]

Hayes claims that, after she returned to work from STD leave, she submitted a document seeking breaks as accommodation via the MyHR portal but never received a response from Schwab.[58] Hayes has not produced any documents supporting her assertion that she submitted a request for breaks as an accommodation,[59] nor does Schwab have any record that Hayes made such a request after her return to work.[60] Schwab's process for requesting a reasonable accommodation is set forth, among other places, at the end of Hayes's most recent offer letter: "Should you need an accommodation to perform the essential functions of your new position, please call or write the Accommodations Team now or in the future at accommodations@Schwab.com or 1-800-275-1281."[61]

---

[54] Ex. A, Hayes Dep., at 50:18-21; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[55] Ex. A, Hayes Dep., at 54:8-13; Ex. 2 to Hayes Dep. at Schwab/Hayes 001247; Ex. 1 to Ex. B at Schwab/Hayes 001102.

[56] Ex. A, Hayes Dep., at 52:4-8, 52:12-19; Ex. B, DiSanzo Decl., at ¶ 3.

[57] Ex. A, Hayes Dep., at 56:18-21.

[58] Ex. A, Hayes Dep., at 77:5-78:21.

[59] Ex. A, Hayes Dep., at 77:14-78:1 (describing a form completed by her doctor that she possessed in electronic copy and uploaded to the MyHR portal), 82:7-9 (stating she "would have to find that document").

[60] Ex. B, DiSanzo Decl., at ¶ 3.

[61] Ex. 1 to Ex. A, Hayes Dep., at Schwab/Hayes 000001–02.

## H.    Hayes Receives a Written Warning

According to Hayes, "everything was going normal" after she returned from STD leave, and it was not until a few weeks after her return that Bergeron resumed conversations about her performance "through Teams meetings."[62] Then, on July 13, 2023, Bergeron issued Hayes a Written Warning for her performance.[63] The only aspect of Hayes's performance discussed in the Written Warning was "Call Transfer and Ownership Expectations."[64] Specifically, Hayes was continuing to transfer calls "to other departments for topics that are owned by the Service team," "without a full review of the question/situation," "a consultation or a warm transfer."[65] The Written Warning instructed Hayes, "If you feel that you are unsure of the answers to the [advisor's] question, you should prioritize research leveraging Schwab Advisor Center, review of Client Central and MyQ, Knowledge Center, and utilization of the Team Chat to assist with identifying available resources and/or assistance with answering the [advisor's] questions."[66] As the Written Warning explained, "These behaviors are detrimental to the Advisor experience and that of our fellow coworkers who receive these transfers with no detail."[67] Accordingly, as the Written Warning stated, "Failure to improve and/or sustain an acceptable level of performance…may result in further corrective action, up to and including immediate termination of your employment."[68]

---

[62] Ex. A, Hayes Dep., at 55:10-17.

[63] Ex. A, Hayes Dep., at 55:17-56:17; Ex. 6 to Hayes Dep. at Hayes 104.

[64] Ex. 6 to Ex. A, Hayes Dep.

[65] Ex. 6 to Ex. A, Hayes Dep., at Hayes 104.

[66] Ex. 6 to Ex. A, Hayes Dep., at Hayes 104.

[67] Ex. 6 to Ex. A, Hayes Dep., at Hayes 104.

[68] Ex. 6 to Ex. A, Hayes Dep., at Hayes 105.

Hayes contends that some of the calls she transferred were to departments on the list  to which she could make a cold transfer and were not topics that she could have "owned."[69] She also denies making these transfers "without a full review of the question/situation."[70] Hayes further denies that she continued to transfer advisor calls without a consultation or warm transfer.[71] Hayes further contends that she had been utilizing the resources Bergeron identified, "especially with the Team Chat, as well as Knowledge Center."[72] However, she asserts that she did not always receive a prompt response in the team chat:

> Sometimes I would take up to five to ten minutes to try to get a response, up to 30 minutes even, from the Team Chat, and no one was available to assist, which led to me having to place the IA on the phone -- on the phone call for an ample amount of time.[73]

On the other hand, Hayes concedes that Bergeron had previously coached her to prioritize research and leverage the available resources to assist in answering advisors' questions.[74] She further admits that she knew what Bergeron considered to be her performance deficits.[75]

## I.    After Bergeron Initiated Termination of Her Employment, Hayes Begins Maternity Leave Earlier Than Planned

On September 5, 2023, Bergeron contacted Schwab's Employee Relations ("ER") group to discuss next steps, including the possibility of terminating Hayes's employment.[76] Bergeron met with ER on September 8, 2023 to discuss corrective action options and advised ER that he

---

[69] Ex. A, Hayes Dep., at 58:20-59:7.

[70] Ex. A, Hayes Dep., at 59:8-17.

[71] Ex. A, Hayes Dep., at 61:16-62:7.

[72] Ex. A, Hayes Dep., at 62:8-63:6.

[73] Ex. A, Hayes Dep., at 63:6-10.

[74] Ex. A, Hayes Dep., at 63:16-64:4.

[75] Ex. A, Hayes Dep., at 64:5-7.

[76] Ex. B, DiSanzo Decl., at ¶ 4; Ex. 2 to Ex. B at Schwab/Hayes 001110, 001112.

316732942v.5

wanted to proceed with termination.[77] After Bergeron had initiated her termination, Hayes notified Bergeron that she was being hospitalized for her high-risk pregnancy and would begin her maternity leave, which was FMLA leave, early.[78] According to Hayes, Bergeron told her that he understood, but that after she returned from leave, they would have to discuss whether she would continue working for Schwab.[79] Schwab granted Hayes's request for FMLA leave, beginning September 13, 2023.[80] Hayes concedes that, while she was on leave from September 2023 to February 2024, she received the benefits to which she was entitled under Schwab's policy.[81]

## J.    Schwab Terminates Hayes's Employment

Schwab terminated Hayes's employment on February 12, 2024.[82] Bergeron and Alexander met with Hayes upon her return from leave to communicate the termination decision.[83] According to Hayes, Alexander told her they made the decision to separate her from the company because of her "metrics and things that [they] noticed."[84] Based on the conversation she had had with Bergeron prior to her leave, which was "leaning towards" the likelihood that

---

[77] Ex. B, DiSanzo Decl., at ¶ 4; Ex. 2 to Ex. B at Schwab/Hayes 001112.

[78] Ex. A, Hayes Dep., at 104:3-18; Ex. 2 to Ex. B at Schwab/Hayes 001112.

[79] Ex. A, Hayes Dep., at 104:18-22.

[80] Ex. A, Hayes Dep., at 105:16-17; Ex. B, DiSanzo Decl., at ¶ 5.

[81] Ex. A, Hayes Dep., at 112:17-25.

[82] Ex. A, Hayes Dep., at 125:25-126:7; Dkt. No. 1, Plaintiff's Complaint and Jury Demand, at ¶ 35.

[83] Ex. A, Hayes Dep., at 106:15-20.

[84] Ex. A, Hayes Dep., at 114:11-17.

Schwab would terminate her employment, Hayes had already begun pursuing other employment opportunities while she was on maternity leave.[85]

## IV.    ARGUMENT

### A.    Summary Judgment Standard

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 839 (5th Cir. 2012).

### B.    Plaintiff's PWFA Claim Fails As a Matter of Law

Hayes admits that her PWFA claim is limited to her claim that she was not approved to take breaks without penalty.[86] This claim cannot survive summary judgment for one crucial reason: there is no evidence that Hayes ever made a request to take breaks without penalty while the PWFA was in effect. The PWFA took effect on June 27, 2023[87] and does not apply retroactively. *See, e.g., Alexander v. Two Oaks Invs., LLC*, No. 23-CV-00406-SH, 2024 WL 3747166, at *5 (N.D. Okla. Aug. 9, 2024) (dismissing PWFA claims based on events that occurred prior to the statute's effective date). Hayes claims to have discussed her pregnancy and

---

[85] Ex. A, Hayes Dep., at 125:9-127:10; Ex. 10 to Hayes Dep. at Hayes 227 (job offer dated February 21, 2024).

[86] Ex. A, Hayes Dep., at 121:15-122:3.

[87] Consolidated Appropriations Act, Pub. L. 117-328, div. II, § 109, 136 Stat. 4459, 6089 (2022) ("This division [enacting this chapter and provisions set out as a note under this section] shall take effect on the date that is 180 days after the date of enactment of this Act [December 29, 2022].").

the need to take frequent breaks: (1) with Bergeron, prior to her April 7, 2023 Coaching Memo and (2) with Alexander, after her April 7, 2023 Coaching Memo.[88] These requests were months before the PWFA took effect and were followed by an STD leave of more than two months.[89] Hayes returned to work on June 26, 2023, the day before the PWFA took effect.[90] Although Hayes claims to have submitted a form requesting breaks as an accommodation after she returned from STD leave, she has not produced the form, and Schwab has no record of receiving it.[91] And Hayes admits that she did not raise a concern with HR about her breaks after returning from STD leave.[92] There is thus no evidence that Hayes requested breaks as an accommodation while the PWFA was in effect.

### C.     Schwab Is Entitled to Summary Judgment on Plaintiff's FMLA Retaliation Claim

Hayes's claim for FMLA discrimination/retaliation under 29 U.S.C. § 2615(a)(2) fails as a matter of law. Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," which establishes the FMLA's leave requirements. 29 U.S.C. § 2615(a)(2). "The Department of Labor has interpreted this statutory provision to forbid employers from terminating employees for having exercised or attempted to exercise FMLA rights." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013) (citing 29 C.F.R. § 825.220(c) (interpreting FMLA to prohibit employers' "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions")). "To make a

---

[88] Ex. A, Hayes Dep., at 31:21-32:24, 50:5-9, 87:6-22.

[89] Ex. A, Hayes Dep., at 52:4-8, 52:12-19; Ex. B, DiSanzo Decl., at ¶ 3.

[90] Ex. A, Hayes Dep., at 52:4-8, 52:12-19; Ex. B, DiSanzo Decl., at ¶ 3.

[91] Ex. B, DiSanzo Decl., at ¶ 3.

[92] Ex. A, Hayes Dep., at 64:23-65:19.

prima facie case of retaliatory discharge, the employee must show that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge." *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (citation omitted).

Absent direct evidence of retaliatory intent, the Fifth Circuit has typically applied "the familiar *McDonnell–Douglas*[93] burden shifting framework to determine whether an employer discharged an employee in retaliation for participating in FMLA-protected activities." *Id.* Under that framework, if the employee establishes *prima facie* retaliation, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* The employee then can proceed under either the pretext or mixed-motive framework.[94] *Id.* at 332–33. "The mixed-motive framework applies to cases in which the employee concedes that discrimination was not the *sole* reason for her discharge, but argues that discrimination was *a* motivating factor in her termination." *Id.* at 333 (italics in original). Here, because Hayes has not conceded that discrimination was not the sole reason for her termination, i.e., that Schwab's articulated reason for terminating her was true, the Court should apply the pretext framework.

As discussed below, because Hayes cannot show *prima facie* retaliation, Schwab is entitled to summary judgment on her Section 2615(a)(2) retaliation claim regardless of which

---

[93] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[94] More recently, the Fifth Circuit has expressed serious doubt as to whether the mixed-motive framework "is ever proper for FMLA retaliation claims" in light of the Supreme Court's decisions in *Nassar* and *Gross*. *See Adams v. Mem'l Hermann*, 973 F.3d 343, 353 (5th Cir. 2020) (discussing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)). However, because the *Adams* case did not require the Fifth Circuit to decide whether a mixed-motive causation standard remains viable in Section 2615(a)(2) retaliation cases, it reserved that issue for another day. *Adams*, 973 F.3d at 353 and n.12; *see also Stanton v. Jarvis Christian Coll.*, No. 20-40581, 2022 WL 738617, at *6 (5th Cir. Mar. 11, 2022); *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 529 n.4 (5th Cir. 2021) (same).

framework applies. Further, even if Hayes could establish a *prima facie* case, her claim still would fail, as she cannot point to any evidence of pretext or retaliatory motive.

> ### 1. Hayes Cannot Show Causation Necessary to Establish a *Prima Facie* Case of FMLA Retaliation

Hayes does not point to any evidence of a causal relationship between her request for or taking of FMLA leave, other than the fact that Schwab terminated her employment on the day that she returned from leave.[95] Where the plaintiff offers no evidence of causation apart from the temporal proximately between her protected activity and her termination, the temporal proximity must be "very close," and—following Supreme Court precedent "that three months is not within the 'very close' requirement"—the Fifth Circuit has found that 2.5 months is not "very close." *Besser v. Texas Gen. Land Off.*, 834 F. App'x 876, 884–85 (5th Cir. 2020) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) and "conclud[ing] that two and one-half months between the protected activity and the adverse employment decision, standing alone, is not within the 'very close' proximity that is necessary to establish causation").

Here, Hayes first became eligible for FMLA leave on August 8, 2023. *See* 29 U.S.C. § 2611(2)(A) (defining "eligible employee" as one who has been employed by the employer for at least 12 months and for at least 1,250 hours of service during the previous 12-month period). The FMLA entitles eligible employees to twelve weeks of job-protected leave in any twelve-month period if the leave is for qualifying reasons, including, among others, for the birth of a child, to care for that newborn child, and for the employee's own serious health condition. 29 U.S.C. §§ 2612(a)(1), 2614(a)(1).

---

[95] Ex. A, Hayes Dep., at 106:15-20.

316732942v.5

Hayes gave notice of her intent to take FMLA leave on approximately July 21, 2023, three months before her anticipated leave,[96] and ultimately began her leave earlier than anticipated, on September 13, 2023.[97] Accordingly, Hayes exhausted her twelve weeks of FMLA leave on December 6, 2023, more than two months before she returned to work on February 12, 2024. Schwab thus terminated Hayes more than six months after she gave notice of her intent to take FMLA leave, and more than two months after the FMLA-protected portion of her maternity leave ended. "While this [more than two-month] time period is short, it is not, by itself, enough to show a causal connection based upon temporal proximity alone." *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 401–02 (5th Cir. 2012) (per curiam) (where employee remained on leave after FMLA entitlement expired, measuring temporal proximity from the end of the FMLA-protected portion of the leave to the date of termination). Hayes thus cannot establish the causation element of her *prima facie* case, and her FMLA retaliation claim fails as a matter of law.

### 2.    Hayes Cannot Show Pretext or Retaliatory Motive

Even if Hayes could establish *prima facie* FMLA retaliation, she cannot carry her burden to show a genuine issue of material fact that: (a) Schwab's reason for terminating her was pretext for retaliation or (b) if she concedes that Schwab's reason is true, that her exercise of FMLA rights was a motivating factor in the termination decision.

As discussed above, Schwab terminated Hayes for poor performance. Hayes's performance deficiencies were well-documented before her July 2023 notice of her intent to take FMLA leave. Her April 2023 Coaching Memo and July 2023 Written Warning—both of which predate Hayes's FMLA notice—each communicated to Hayes that failure to improve her

---

[96] Ex. A, Hayes Dep., at Ex. 3 (request for leave beginning October 22, 2023).

[97] Ex. B, DiSanzo Decl., at ¶¶ 4-5; Ex. 2 to Ex. B at Schwab/Hayes 001112.

performance, or to sustain such improvements, could result in further corrective action, including discipline. Where, as here, an employee is already subject to corrective action and aware that failure to improve may result in termination before giving notice of FMLA leave, that employee cannot carry her burden to raise a fact issue as to whether the employer's reasons for terminating her are pretext for FMLA retaliation. *See, e.g.*, *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583–85 (5th Cir. 2006) (affirming summary judgment in favor of employer, where plaintiff was terminated after requesting FMLA leave); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 196 (5th Cir. 2014) (affirming summary judgment for employer where plaintiff failed to produce substantial evidence of pretext in light of evidence that employer "initiated performance-improvement measures prior to [plaintiff's] FMLA leave"); *Tuberville v. Pers. Fin. Corp.*, No. 3:95CV150-B-A, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996) (finding "no evidence that plaintiff's request for leave had any affect [sic] on the defendant's ultimate decision to terminate the plaintiff's employment," where plaintiff had been placed on 90-day notice of need for improvement two months prior to request).

Nor can Hayes show evidence of pretext or retaliatory intent by disputing some of the performance feedback set forth in the Coaching Memo and Written Warning.  Hayes claims that, while she did not have the highest metrics on her team, her metrics were better than some of her teammates.[98] However, the Coaching Memo raised several performance deficiencies unrelated to metrics, and the Written Warning did not mention metrics at all.[99] Indeed, Hayes received extensive corrective feedback about the manner in which she handled advisor calls. Hayes essentially disagrees that some of the cold transfers she made were impermissible and that she

---

[98] Ex. A, Hayes Dep., at 103:14-23.

[99] *See* Exs. 5 and 6 to Ex. A, Hayes Dep. Hayes does not know whether any of her teammates received similar corrective action. Ex. A, Hayes Dep., at 103:24-104:2.

failed to complete a full review of the advisors' questions before transferring calls. But simply showing that she and Bergeron disagreed—or even that Bergeron was wrong—about the quality of her performance is not enough to defeat summary judgment. As the Fifth Circuit has emphasized, it is not a reviewing court's job "to engage in second-guessing of an employer's business decisions." *Ray*, 587 F. App'x at 191 (quoting *LeMaire v. La. Dep't of Transp. and Dev.*, 480 F.3d 383, 391 (5th Cir. 2007)). Indeed, "a showing that an employer's belief was incorrect 'merely implies that an employer may have made a mistake in deciding to take action against an employee,' and …'even an incorrect belief that an employee's performance is inadequate qualifies as a legitimate reason' to take an adverse employment action." *Id.* (quoting *Haverda v. Hays County*, 723 F.3d 586, 596 n.1 (5th Cir. 2013)). Thus, an employee must present evidence to support an inference that the employer had "retaliatory motive, not just an incorrect belief," and "an employee's mere challenge to the underlying facts of an employer's decision, or the employer's assessment of those facts, are insufficient to create a fact issue of pretext." *Id.* at 191–92.

But Hayes cannot point to any evidence to support an inference that Schwab (or her supervisors, Bergeron and Alexander) acted with retaliatory motive. On the contrary, after months of coaching Hayes on her substandard performance, Bergeron had initiated the termination process before Hayes began her FMLA leave, but he put the process on "pause" while she was on leave.[100] Hayes then remained on leave for two months after her FMLA entitlement was exhausted, and she continued to receive benefits while on leave. The evidence thus shows that Schwab continued to employ Hayes longer than she otherwise would have been

---

[100] Ex. B, DiSanzo Decl., at ¶ 4; Ex. 2 to Ex. B at Schwab/Hayes 001112.

316732942v.5

employed because she took FMLA and other leave. Hayes thus cannot carry her burden to show

a genuine, material fact issue on her FMLA retaliation claim.

## V.    CONCLUSION

For the foregoing reasons, Defendant Charles Schwab & Co., Inc. respectfully requests

that the Court grant its Motion for Partial Summary Judgment, dismiss Plaintiff Brandy Hayes's

claims under the Family and Medical Leave Act and Pregnant Workers Fairness Act with

prejudice, and grant Defendant any additional relief to which Defendant is entitled.


Respectfully submitted,

By: /s/ Linda C. Schoonmaker
    Linda C. Schoonmaker
    State Bar No. 17806300
    SEYFARTH SHAW LLP
    700 Milam Street, Suite 1400
    Houston, Texas  77002-2812
    Telephone:  (713) 225-2300
    Facsimile:  (713) 225-2340
    lschoonmaker@seyfarth.com

    ATTORNEY FOR DEFENDANT
    CHARLES SCHWAB & CO., INC.

### CERTIFICATE OF SERVICE

I certify that on the 25th day of March, 2025 I served the above-referenced Notice  by
ECF notification on:

Christine A. Hopkins
Tremain Artaza PLLC
4925 Greenville Avenue, Suite 200
Dallas, Texas 75206


/s/ Linda C. Schoonmaker
Linda C. Schoonmaker